# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FEDERICO MARES-MORENO,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE
OF ELVIA ALVAREZ (DECEASED), and
AS NEXT FRIEND OF GENESIS
ALVAREZ (MINOR CHILD), SIMON
ALVAREZ, SR., and IVAN ALVAREZ,

      Plaintiffs,

vs.                                                                             No. CIV 16-0451 JB/KBM

JASMAIL SINGH, SUKHDEV SINGH and
CHAHAL TRANSPORT, INC.

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the parties' Stipulated Petition for Approval of the Settlement of Minors' Claims, filed January 11, 2017 (Doc. 25)("Petition"); and (ii) the Plaintiffs' Motion to Approve Settlement, filed July 10, 2017 (Doc. 33)("Motion"). The Court held a hearing on July 31, 2017. The primary issue is how the Court should distribute the settlement funds from a wrongful death action amongst Plaintiff Federico Mares-Moreno, Plaintiff Genesis Alvarez, Plaintiff Simon Alvarez, Sr., and the decedent's son, Jesus Alvarez. The Court concludes that it will deny the Petition and Motion, but that it will approve a settlement that distributes the funds in the following manner: $200,000.00 for Mares-Moreno; $500,000.00 for G. Alvarez; $75,000.00 for S. Alvarez; and $225,000.00 for J. Alvarez. The money allocated to G. Alvarez and J. Alvarez will be held in trust. J. Alvarez' trust will distribute $500.00 per month to his grandfather, S. Alvarez, until J. Alvarez' eighteenth birthday.

After J. Alvarez' eighteenth birthday, the trust will distribute $1000.00 per month to J. Alvarez. G. Alvarez' trust will not have a monthly distribution.

## FACTUAL BACKGROUND

This case arises from a car accident on Interstate 40. See Complaint for Wrongful Death and Personal Injury ¶ 9, at 3, filed May 17, 2016 (Doc. 1)("Complaint"). On May 5, 2016, Federico Mares-Moreno was driving east on I-40 with three passengers in a 2007 GMC Yukon. See Complaint ¶ 9, at 3. His wife, Elvia Alvarez, sat in the vehicle's backseat with their then four-year-old daughter, G. Alvarez. See Draft Transcript of Motion Hearing at 2:17-19 taken July 31, 2017)("Tr.")(Glasheen).[1] G. Alvarez was not wearing a seatbelt. See Tr. at 34:2-3 (Oakey). E. Alvarez' father, S. Alvarez., rode in the passenger side seat. See Tr. at 2:16-17 (Glasheen). The four of them were driving to Louisiana so that Mares-Moreno could begin a new job. See Tr. at 5:7-9.

Also driving east on I-40 was Jasmail Singh in a 2012 Freightliner -- a tractor trailer. See Complaint ¶ 9, at 3. At some point, while driving east, J. Singh "lost control of his vehicle," "jerked the tractor-trailer to the left," and, while attempting to regain control of the vehicle, collided with the GMC Yukon's passenger side, causing it to roll. Complaint ¶ 9, at 3. The collision ejected G. Alvarez from the vehicle, causing several injuries, including: a collapsed lung; a brain bleed; an upper-right-arm fracture; a left-thigh fracture; a liver laceration; pelvis fractures; a back-compression fracture; a hip fracture; and a broken skull bone. See Tr. at 33:25-35:10 (Mares-Moreno, Oakey). The collision killed E. Alvarez. See Complaint ¶ 11, at 3. Both

---

[1]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Mares-Moreno and S. Alvarez also suffered injuries.  See Tr. at 12:1-4 (Alvarez, Glasheen); Petition ¶ 9, at 2.

For her injuries, G. Alvarez underwent two surgeries for her leg and her right shoulder. See Tr. at 35:11-13 (Mares-Moreno, Oakey).  Afterward, she used a walker to aid in her mobility for a month, and sometimes still walks with a limp.  See Tr. at 35:14-24 (Mares-Moreno; Oakey).  G. Alvarez had physical therapy sessions, and, according to Mares-Moreno, she is "much better" now.  Tr. at 35:25-36:15 (Mares-Moreno, Oakey).  G. Alvarez' medical bills amount to $174,462.19.  See Guardian Ad Litem Report at 5, filed July 27, 2017 (dated July 26, 2017)(Doc. 35)("Report").  Although he believes that G. Alvarez is better now, Mares-Moreno thinks that G. Alvarez "might need some counseling, some therapy" from losing her mother.  Tr. at 37:1-5 (Mares-Moreno).  Mares-Moreno's medical bills amount to $698.00 and S. Alvarez' equaled $31,332.30.  See Report at 5.  Social Security provides Mares-Moreno $708.00 per month survivor benefits for G. Alvarez.  See Tr. at 40:1-7 (Mares-Moreno, Oakey).

E. Alvarez had another child who was not in the accident -- J. Alvarez -- from a previous relationship.  See Tr. at 18:19-22 (Allen, Alvarez); Tr. at 21:17-22 (Allen, Alvarez); Petition ¶ 11, at 3.   J. Alvarez lives with Mares-Moreno, G. Alvarez, and his grandfather, S. Alvarez, in the same home, and Mares-Moreno has helped raise J. Alvarez, even though he is not Mares-Moreno's biological son.  See Tr. at 15:11-13, 20; 24:15-17 (Alvarez, Glasheen, Mares-Moreno). According to S. Alvarez, J. Alvarez' biological father has "never helped with anything" for J. Alvarez, and S. Alvarez has not heard from J. Alvarez' biological father since E. Alvarez died. Tr. at 19:1-5 (Allen, Alvarez).  Following the accident, S. Alvarez was named kinship guardian to J. Alvarez.  See Motion ¶ 2, at 2.

## PROCEDURAL HISTORY

On May 17, 2016, Mares-Moreno, individually and as personal representative of E. Alvarez' Estate, and as next friend of G. Alvarez, S. Alvarez, and Ivan Alvarez (collectively "Plaintiffs") filed suit for wrongful death and personal injury against J. Singh, Sukhdev Singh, and Chahal Transport, Inc. (collectively "Defendants"). See Complaint at 1. S. Singh owned the tractor-trailer that collided with the GMC Yukon, and Chahal Transport employed J. Singh. See Complaint ¶¶ 4-5, at 2. I. Alvarez owned the GMC Yukon. See Tr. at 63:6-7 (Allen). The Plaintiffs allege that J. Singh negligently operated the tractor-trailer, resulting in the collision and committed negligence per se by violating several federal and New Mexico state laws. See Complaint ¶¶ 13-23, at 4-7. The Plaintiffs further allege that S. Singh and Chahal Transport negligently hired and supervised J. Singh, which resulted in the collision. See Complaint ¶¶ 24-30, at 7.

After the Plaintiffs filed suit, the Defendants' insurer -- Progressive Michigan Insurance Company ("Progressive") -- tendered its one million dollar policy limit to all Plaintiffs and any claimants who might have a claim arising from the accident. See Petition ¶ 10, at 2-3. The parties subsequently negotiated a one million dollar settlement. See Petition ¶ 13, at 1, 3. This settlement, however, was "subject to the court's approval," because New Mexico requires a judge to approve settlements that bind minors. Petition ¶ 13, at 3. See Motion ¶ 7, at 3. The Court subsequently appointed Kathleen Oakey as Guardian Ad Litem to investigate the appropriate course for the children's best interest. See Stipulated Order Appointing Guardian Ad Litem, filed January 31, 2017 (dated January 21, 2017)(Doc. 27).

The Plaintiffs proposed the following initial settlement agreement and apportionment amount to Ms. Oakey:

| Plaintiffs' Initial Proposal | | | | |
|---|---|---|---|---|
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$400,000.00** | **$200,000.00** | **$200,000.00** | **$200,000.00** |

<u>See</u> Report at 8 n.11 ("Plaintiffs' Initial Proposal"). Ms. Oakey raised concerns regarding the amount given to S. Alvarez and countered with the following proposal:

| Guardian Ad Litem Proposal | | | | |
|---|---|---|---|---|
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$525,000.00** | **$200,000.00** | **$200,000.00** | **$75,000.00** |

<u>See</u> Report at 8, n.11 ("Guardian Ad Litem Proposal"). According to Ms. Oakey, the Plaintiffs "agreed" to her proposal, "then subsequently changed their mind" and proposed the following:

| Plaintiffs' Compromise Proposal | | | | |
|---|---|---|---|---|
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$400,000.00** | **$300,000.00** | **$200,000.00** | **$100,000.00** |

<u>See</u> Report at 2. ("Plaintiffs' Compromise Proposal"). The Plaintiffs also proposed to Ms. Oakey that they would set up a trust for both children that would distribute $750.00 per month to aid in raising and supporting them. <u>See</u> Report at 9.[2] The $750.00 allocation would continue for both children until they turned eighteen. <u>See</u> Report at 9. S. Alvarez, as J. Alvarez' guardian, would receive J. Alvarez' allocation; Mares-Moreno, as G. Alvarez' father, would receive G. Alvarez allocation. <u>See</u> Report at 9.

---

[2]The Plaintiffs originally planned an annuity for the children, but their settlement planner later determined a trust would better meet the family's needs. <u>See</u> Tr. at 46:16-47:1 (Tombs).

1. **Motion to Approve Settlement.**

On July 10, 2017, the Plaintiffs motioned for the Court to approve the settlement. See Motion at 1. By this time, however, the Plaintiffs had reverted to their original Plaintiffs' Initial Proposal:

| Plaintiffs' Initial Proposal | | | | |
|---|---|---|---|---|
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$400,000.00** | **$200,000.00** | **$200,000.00** | **$200,000.00** |

See Motion ¶ 5, at 2-3. In their Motion, the Plaintiffs expand on these figures, adding that this allocation results in the following net recovery for each claimant -- after subtracting projected attorney's fees and medical costs from the allocated amount:

| Plaintiffs' Initial Proposal Net Recovery Projection | | | | |
|---|---|---|---|---|
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$223,177.00** | **$142,347.00** | **$140,953.00** | **$128,246.00** |

See Motion ¶ 5, at 2-3. According to the Plaintiffs, this apportionment considers all parties' interests and covers G. Alvarez' severe injuries and the loss of her mother; J. Alvarez' loss of his mother; Mares-Moreno's injuries, the loss of his wife, and financial support for G. Alvarez; and S. Alvarez' injuries, the loss of his daughter, and financial support for J. Alvarez. See Motion ¶ 12, at 5.

In support of the Plaintiffs' Initial Proposal, the Plaintiffs argue that, when approving a settlement involving minors, the Court "must determine if the settlement is fair and reasonable." Motion ¶ 8, at 3 (citing Jones v. Nuclear Pharm., Inc., 741 F.2d 322, 324 (10th Cir. 1984)). They argue that the Court further must consider four factors in the fair-and-reasonable analysis:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

Motion ¶ 8, at 3-4 (citing Jones v. Nuclear Pharm., Inc., 741 F.2d at 324). The Plaintiffs aver that, after considering those factors, "the settlement agreement . . . is fair and in the best interest of all parties involved," and "no additional insurance is available and . . . the Defendants do not have any recoverable assets if a judgment was obtained." Motion ¶ 8, at 4.

Regarding the Guardian Ad Litem and her proposal, the Plaintiffs argue that Ms. Oakey can negotiate a compromise or settlement, but such a compromise or settlement is not binding "absen[t] judicial approval." Motion ¶ 9, at 4 (citing Decanay v. Mendoza, 573 F.2d 1075 (9th Cir. 1978); Ruddock v. Ohls, 91 Cal.App.3d 271 (1979); Wallace v. Boston Elevated Ry. Co., 194 Mass. 328 (1907)). The Plaintiffs add that Ms. Oakey does not have the authority "to reject the proposed settlement." Motion ¶ 10, at 4. The Plaintiffs also aver that all parties that have the authority to reject the settlement agreement have agreed to the Plaintiffs' Initial Proposal. See Motion ¶ 11, at 5. The Plaintiffs argue that, although Oakey has recommended a larger apportionment for the children, the Court has an independent duty to determine "whether the settlement and apportionment agreements represent the best interest of J. and G. Alvarez." Motion ¶¶ 10, 13, at 5-6 (citing Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047, ¶ 28, 664 P.2d 1000, 1006 overruled on other grounds by Montoya v. AKAL Sec., 1992-NMSC-056, 838 P.2d 971). The Plaintiffs conclude that the Plaintiffs' Initial Proposal is "fair, reasonable, and in the best interests of Genesis and Jesus Alvarez." Motion ¶ 13, at 6.

2. **The Guardian Ad Litem Report.**

On July 27, 2017, Ms. Oakey filed a Guardian Ad Litem Report. See Report at 1. Ms. Oakey wrote the Report based off of the Plaintiffs' Compromise Proposal, unaware that the Plaintiffs had reverted to the Plaintiffs' Initial Proposal. See Tr. at 69:22-25 (Oakey). Accordingly, her Report is based off of the following:

| Plaintiffs' Compromise Proposal | | | | |
|---|---|---|---|---|
| Claimant | G. Alvarez | J. Alvarez | Mares-Moreno | S. Alvarez |
| Amount | $400,000.00 | $300,000.00 | $200,000.00 | $100,000.00 |

See Report at 1-2. Ms. Oakey avers that the $300,000.00 settlement for J. Alvarez is "fair and reasonable under the circumstances," but that G. Alvarez' amount is "unreasonable," and Ms. recommends that the Court should "not approve the settlement." Report at 2. First, Ms. Oakey notes that the value "of each child's claim here exceeds the amount each will receive in settlement," but concludes that, "because Progressive is paying the liability policy limits available," the settlement amount reached for J. Alvarez is "fair and reasonable . . . under the circumstances." Report at 7 (emphasis omitted). For G. Alvarez, however, Ms. Oakey argues that the settlement is unfair, unreasonable, and not in her best interest, because of G. Alvarez' severe injuries, her "arguable future medical needs," and losing her mother far outweigh the "injuries and claims of Mr. Mares Moreno and Mr. Alvarez." Report at 7. Ms. Oakey, accordingly, officially proposes to the Court the Guardian Ad Litem Proposal:

| Guardian Ad Litem Proposal | | | | |
|---|---|---|---|---|
| Claimant | G. Alvarez | J. Alvarez | Mares-Moreno | S. Alvarez |
| Amount | $525,000 | $200,000.00 | $200,000.00 | $75,000.00 |

See Report at 8 n.11.

Ms. Oakey also argues that the $750.00 per month trust disbursements proposed by the Plaintiffs are inappropriate for both G. Alvarez and J. Alvarez. See Report at 9. Ms. Oakey recommends that the Court bar such a disbursement, because Mares-Moreno "is Genesis' biological father, has an ongoing legal and moral obligation to provide[] for her and is capable of working." Report at 9. She argues that a disbursement for J. Alvarez, however, is appropriate, because J. Alvarez' grandparents "have voluntarily sought to raise him, are unemployed and have limited income," but suggests that $500.00 per month would be more appropriate, because his grandparents "already receive $708.00 per month in social security survivor benefits." Report at 9. Ms. Oakey concludes by recommending that the Court approve J. Alvarez' settlement at $300,000.00, but not approve G. Alvarez' settlement at $400,000.00. See Report at 9.

### 3. **The Hearing**.

The Court held a hearing on July 31, 2017. See Tr. at 1:1. The Court heard testimony from three witnesses: Mares-Moreno; S. Alvarez; and Joseph Tombs -- a settlement planner. See Tr. at 44:13-14 (Tombs). Mares-Moreno and S. Alvarez testified generally about the accident, their injuries, their relationship to J. Alvarez and G. Alvarez, and how the two children had responded to the accident. See Tr. at 1:1-42:24.[3]

### a. **Tombs' Testimony**.

Mr. Tombs testified about setting up G. Alvarez' and J. Alvarez' trusts, trust projections, and whether the Plaintiffs' Initial Proposal, the Plaintiffs' Compromise Proposal, and the

---

[3] The Court has already detailed the relevant testimony from Mares-Moreno and S. Alvarez in the Factual Background.

monthly trust allocations are fair and reasonable under the circumstances. <u>See</u> Tr. at 46:16-47:1; <u>id.</u> at 49:2-7; <u>id.</u> at 50:8-24; <u>id.</u> at 51:15-24; <u>id.</u> at 52:21-53:1 (Tombs). First, Mr. Tombs testified that originally he had conceived drafting the settlement so that G. Alvarez and J. Alvarez would receive an annuity, but once "it became apparent that there could be some need for psychological counseling," he determined that a trust would be more appropriate. Tr. at 46:16-25; 47:1 (Tombs). Mr. Tombs forecasted that a trust would "beat rates of return" from an annuity, so the children would also benefit more from a trust. Tr. at 47:11-17 (Tombs). He also argued that a $750.00 payment per month for J. Alvarez is appropriate given that his grandfather and grandmother will raise him. <u>See</u> Tr. at 49:2-7 (Tombs). In contrast, he argued that, because Mares-Moreno "has a legal obligation to provide support for [G. Alvarez]," he had excluded the allocation language from G. Alvarez' trust; instead, he included language "that the trustee, if they find it . . . in Genesis['] best interests[,] the money would be distributed." Tr. at 49:7-11, 14-15 (Tombs).

Mr. Tombs then forecasted the life of the trust assuming certain variables for J. Alvarez and G. Alvarez. <u>See</u> Tr. at 50:8; <u>id.</u> at 50:11; <u>id.</u> at 50:16-24; <u>id.</u> at 51:15-24; <u>id.</u> at 91:20-92:1; <u>id.</u> at 92:17 (Tombs). Based on J. Alvarez' $300,000.00 amount from the Plaintiffs' Compromise Proposal, Mr. Tombs projects the following:

| J. Alvarez Projection $300,000.00 | | | | | |
|---|---|---|---|---|---|
| Investment Amount | Net Rate of Return | Monthly Allocation until Eighteenth Birthday | Monthly Allocation from Eighteenth until Twenty-Fifth Birthday | College Allocation | Remaining Amount |
| **$211,806.00** | **6.1** | **$750.00** | **$1,000.00** | **$52,000.00** | **155,000.00** |

See Tr. at 50:8; id. at 50:11; id. at 50:16-24 (Tombs). Based on J. Alvarez' $200,000.00 from the Plaintiffs' Initial Proposal, Mr. Tombs projects:

| J. Alvarez Projection $200,000.00 | | | | | |
|---|---|---|---|---|---|
| Investment Amount | Net Rate of Return | Monthly Allocation until Eighteenth Birthday | Monthly Allocation from Eighteenth until Twenty-Fifth Birthday | College Allocation | Remaining Amount |
| **$140,000.00** | **6.1** | **$750.00** | **$1,000.00** | **$52,000.00** | **~$0** |

See Tr. at 91:20-92:1; id. at 92:17 (Tombs). He also projects that, at $200,000.00, the trust would generate "close to [$]700 or [$]800" per month in interest. Tr. at 92:21-22 (Tombs). Based on G. Alvarez' $400,000.00 from the Plaintiffs' Compromise Proposal, Mr. Tombs projects the following:

| G. Alvarez Projection $400,000.00 | | | | | |
|---|---|---|---|---|---|
| Investment Amount | Net Rate of Return | Monthly Allocation until Eighteenth Birthday | Monthly Allocation from Eighteenth until Twenty-Fifth Birthday | College Allocation | Remaining Amount |
| **245,000.00** | **6.1** | **$750.00** | **$1,000.00** | **$56,000.00** | **$300,000.00** |

See Tr. at 51:15-24 (Tombs).

Mr. Tombs opined that the Plaintiffs' Initial Proposal "could be reasonable" and that the Plaintiffs' Compromise Proposal would be reasonable. Tr. at 52:21-53:1 (Glasheen, Tombs).

Mr. Tombs further testified that his fees for managing the trust were "75 basis points," but that the total fee "is never more than 1.5 percent . . . of the assets per year."  Tr. at 57:3-9 (Court, Tombs).  He testified that this fee was a standard one for managing a minor trust, and that he had chosen the trust company, because "they have a very small minimum fee."  Tr. at 57:10-14 (Court, Tombs).

### b.  The Parties' Arguments.

The Plaintiffs opened by asking that the Court approve the Plaintiffs' Initial Proposal or to approve the Plaintiffs' Compromise Proposal.  See Tr. at 58:10-15 (Glasheen).  Regarding the difference for G. Alvarez between the Guardian Ad Litem's Proposal and the Plaintiffs' two proposals, the Plaintiffs contended that the $38,000.00 medical bill subrogation lessened G. Alvarez' expenses, and also averred that G. Alvarez' injuries are not that severe any longer -- "we're talking about fractures, essentially a fractured leg and arm bone from which the child has made a very good recovery."  Tr. at 58:15-23 (Glasheen).  They argued that G. Alvarez exhibits no signs "of permanent impairment . . . and [there is] certainly no evidence of any head injury."  Tr. at 58:23-59:1 (Glasheen).  They also noted that "we shouldn't forget that Jesus lost his only parent," and that every family member has lost a wife, a mother, or a daughter.  Tr. at 59:2-6 (Glasheen).  Moreover, they contended that G. Alvarez likely will "not remember her injuries" and argued that G. Alvarez receiving over half the money "is simply not reasonable."  Tr. at 59:9-15.  They closed by emphasizing that "this is a close knit family who care about each other" and that "their plan for taking care of themselves is well grounded."  Tr. at 59:16-21 (Glasheen).

The Court noted that the Plaintiffs "were [in] agreement substantially, not fully but substantially" with Ms. Oakey's critique that S. Alvarez "receiving 20 percent" was too much.  Tr. at 60:15-18 (Court).  The Plaintiffs agreed and explained that part of the reasoning behind

twenty percent to S. Alvarez "was so that he could help raise Jesus," but that the monthly trust payments "accomplishes the clients' goal." Tr. at 60:22-61:4 (Glasheen). The Plaintiffs added that they also shifted the money from S. Alvarez to J. Alvarez, instead of to G. Alvarez, because "Jesus arguably suffered a greater loss there since he has no [biological] father." Tr. at 61:15-17 (Glasheen). They conceded that G. Alvarez had "significant orthop[]edic injuries," but that they thought "giving Genesis an extra hundred thousand dollars in light" of the $38,000.00 medical subrogation and her "excellent recovery" was inappropriate. Tr. at 61:18-62:3 (Glasheen).

The Defendants asserted that they "wanted this case resolved to secure finality," and they stressed that the one million dollar settlement would achieve finality given that the Plaintiffs had "agreed and accepted" that amount. Tr. at 62:16-20 (Allen). They also argued that I. Alvarez, the vehicle's owner, should be dismissed from the case, because he did not have a claim, and the Plaintiffs' counsel agreed. See Tr. at 63:4-16 (Allen). Regarding the apportionment agreement, the Defendants stated that they did not take a position, but added that if this case was "simply a wrongful death claim," J. Alvarez could, at most, secure $250,000.00. Tr. 64:2-16 (Allen). The Defendants also noted that, under New Mexico law, the wrongful death claim subsumes the "loss of consortium claims" and that the insurance policy does not cover emotional injury claims. Tr. 64:18-65:10; 69:7-12 (Allen).

Ms. Oakey began by stressing that she did not realize that the Plaintiffs had returned to the Plaintiffs' Initial Proposal. See Tr. 69:22-25 (Oakey). She contended that, when reviewing the Plaintiffs' Initial Proposal, her first concern, is that "there was no specific dollar amount earmarked for the wrongful death estate." Tr. at 70:8-11 (Oakey). According to Ms. Oakey, the wrongful death estate calculation is important to determine "how much should be given to Genesis" and to J. Alvarez. Tr. at 70:24-25 (Oakey). She explained that she came to the

Guardian Ad Litem Proposal by considering the wrongful death estate as a claimant, in addition to G. Alvarez, J. Alvarez, S. Alvarez, and Mares-Moreno as individual claimants.  <u>See</u> Tr. at 72:23-73:2 (Oakey).  She clarified that she settled at Mares-Moreno's $200,000.00 figure based off the Plaintiffs' Initial Proposal, assuming that it was half of the wrongful death estate, to which Mares-Moreno is statutorily entitled.  <u>See</u> Tr. at 73:23-74:7 (Oakey).  She also argued that Mares-Moreno's $200,000.00 was appropriate, because Mares-Moreno had a "small bodily injury claim . . . a bystander liability claim . . . [and] an individual loss of consortium claim assuming the Court is not subsuming" that claim into the wrongful death estate.  Tr. at 73:7-19 (Oakey).  She also contended that her only problem with the Plaintiffs' Initial Proposal is that S. Alvarez receives too much and G. Alvarez too little.  <u>See</u> Tr. at 75:4-8 (Oakey).  Ms. Oakey stressed that S. Alvarez suffered only "soft tissue injuries" and that his only continuing injury is a hurt shoulder.  Tr. at 75:8-13 (Oakey).  She contended, on the other hand, that G. Alvarez "suffered horrific injuries."  Tr. at 75:17-18 (Oakey).  She argued that, based on the injury differences, the discrepancy between S. Alvarez' recovery and G. Alvarez' recovery "raised concerns."  Tr. at 76:5-9 (Oakey).  She also asserted that G. Alvarez' emotional injuries may be more acute, because "studies have shown that the most important person in a child's life is the parent of the same sex."  Tr. at 78:23-25 (Oakey).  Ms. Oakey also stated she was "concerned that [G. Alvarez] doesn't speak," and that "[s]he hasn't received any counseling or therapy."  Tr. at 79:23; 80:5-6. (Oakey).  She concluded that "I think the impact of this accident is much greater on G. Alvarez than any other claimant."  Tr. at 81:13-15 (Oakey).

The Plaintiffs rejoined that Mares-Moreno has "a much bigger claim than is represented in the family apportionment," but he "has given up his claim" in his children's favor.  Tr. at 84:19-22 (Glasheen).  They argue that Mares-Moreno, accordingly, has "[g]iven up some of [his

amount] . . . to Simon [and] his father-in-law[,] because he knows that Simon is helping to raise Jesus." Tr. at 84:22-25 (Glasheen). The Plaintiffs also argued that Ms. Oakey's contention that G. Alvarez "won't speak" is "purely speculation"; they add that G. Alvarez "is a shy kid," but she "chats very comfortably around her family." Tr. 85:7-9 (Glasheen). They also stressed that many of G Alvarez' injuries are not "significant," and there was "simply no evidence of any neurologic deficit or problems." Tr. at 85:10-25 (Glasheen). Stressing that the Plaintiffs' proposals are "a family compromise," the Plaintiffs concluded that the "family is operating in the best interests of the children." Tr. 86:2-13 (Glasheen).

Regarding the monthly trust allocation, Ms. Oakey argued that $500.00 per month would be more appropriate for J. Alvarez. See Tr. at 89:20-21 (Oakey). Ms. Oakey argued that, because the families were already receiving $708.00 per child per month from social security survivor benefits, roughly $1,200.00 per month for J. Alvarez was appropriate. See Tr. at 89:16-22 (Oakey). Mr. Tombs added that the Plaintiffs suggest the $750.00 per month trust allocation, because the Plaintiffs "were very familiar with . . . the financial situation" and, accordingly, are in a better position to determine the right amount. Tr. at 90:21-25 (Tombs). The Plaintiffs also argued that the allocation is appropriate, because forcing the children to live "in abject poverty and then giving them a couple hundred thousand dollars when they turn 25 [is] not in the best interests of the child." Tr. 91:8-11 (Glasheen). Ms. Oakey rejoined that the plaintiffs will not live in "abject poverty" on the $1,200.00 per month allocation she proposed, and that J. Alvarez' grandparents would be able to support J. Alvarez. See Tr. at 94:12-17 (Oakey). She conceded, however, that "the dollar amount difference between [$]500 and [$]750 is not substantial." Tr. at 94:17-19 (Oakey). Regarding a monthly trust allocation for G. Alvarez, however, Ms. Oakey averred that G. Alvarez should have no monthly distribution. See Tr. at 96:13-16 (Court,

Oakey).  The Plaintiffs countered that the monthly trust allocation "still provides that the trustee . . . [will] make a judgment about whether it's in the best interests of the children to make that payment."  Tr. 98: 10-13 (Glasheen).  The Court queried whether it is a good idea to have a provision that affords G. Alvarez trust money in case she wants to attend private school.  See Tr. at 100:24-101:6 (Court).   Ms. Oakey argued that she would rather have "the vast majority of that money . . . be available . . . after they reach the age of majority."  Tr. at 101:7-14.

The Court concluded that it appears that all parties agree that the Plaintiffs' Initial Proposal allocated too much to S. Alvarez.  See Tr. at 105:10-11 (Court).  Based on that agreement, the Court was inclined to take $125,000.00 from S. Alvarez and "move it toward the children."  Tr. at 105:17-19 (Court).   Accordingly, it noted that it is inclined to order the settlement within the following range:

| Court's Proposed Settlement Range | | | | |
| --- | --- | --- | --- | --- |
| **Claimant** | **G. Alvarez** | **J. Alvarez** | **Mares-Moreno** | **S. Alvarez** |
| **Amount** | **$475,000.00-$500,000.00** | **$225,000.00-250,000.00** | **$200,000.00** | **$75,000.00** |

See Tr. at 106:4-7 (Court).   It also noted that it is inclined to order a $500.00 per month allocation from J. Alvarez' trust and that G. Alvarez' trust should not have a monthly payment, but that the Court would agree to a provision in G. Alvarez' trust that Mares-Moreno "can apply for some expenses," but with a cap imposed "so it doesn't totally drain" the trust's principal.  Tr. at 106:8-23 (Court).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be

reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).

Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The

Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme

Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district

court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance

Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M.

2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin

with the statute's text, a court formulating an Erie prediction should look first to the words of the

state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M.

2015)(Browning, J.).[4] If the Court finds only an opinion from the Court of Appeals of New

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in

_____

[4]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014) (Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that where the only opinion on point is "from the Court of Appeals, [] the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[5]

---

[5]The Supreme Court of the United States has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question. We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day. It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> . . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

> . . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts. It is inadmissible that there should

The Court may also rely on decisions by the United States Court of Appeals for the Tenth Circuit interpreting New Mexico law. See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[6] Ultimately, "the Court's task is to predict what the state supreme

---

be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship. In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted). The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

[6]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges. If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's

highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding

that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted). This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Laboratories v. Granite State Ins. Co., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. Co. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-

board, the "would decide" aspect of the <u>Erie</u> analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The <u>Erie</u> doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on <u>Erie</u>, of course, mean little if the Tenth Circuit does not agree. In <u>Wankier v. Crown Equipment Corp.</u>, the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." <u>See</u> <u>The American Heritage Dictionary of the English Language</u> 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [*v. Minnstar, Inc.*, 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case

- 22 -

court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762

F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-

89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

## LAW REGARDING JUDICIAL APPROVAL OF SETTLEMENTS INVOLVING MINORS

New Mexico does not have a statute or rule "governing settlements of claims on behalf of

minors." Shelton v. Sloan, 1999-NMCA-048, ¶ 41, 977 P.2d 1012, 1020. Under New Mexico

common law, however, "[a] trial court in an action involving minor children has a special

obligation to see that they are properly represented, not only by their own representatives, but

also by the court itself." Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047,

¶ 30, 664 P.2d at 1006 overruled on other grounds by Montoya v. AKAL Sec., 1992-NMSC-056,

---

interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest court.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

¶ 12, 838 P.2d at 974 (citations omitted).[7]   "In passing upon settlements dealing with claims or rights of minors, the court must determine whether the approval of a compromise would be in the best interests and welfare of the minor child." Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047, ¶ 30, 664 P.2d at 1006 (citing United States v. Reilly, 385 F.2d 225 (10th Cir. 1967)).   A court is required to reject a settlement "[w]hen a settlement involving a minor is presented to a court for approval and the information before the court indicates that the settlement is not fair to the minor." Shelton v. Sloan, 1999-NMCA-048, ¶ 42, 977 P.2d at 1020. "The court's role in reviewing a settlement is to 'represent' the minor." Shelton v. Sloan, 1999-NMCA-048, ¶ 45, 977 P.2d at 1020 (quoting Bonds v. Joplin's Heirs, 1958-NMSC-095, ¶ 9, 328 P.2d 597, 599).   The Court's role is not to review the "adequacy of the performance of the minor's attorney in reaching the agreement. Rather, it is reviewing the fairness of the agreement itself." Shelton v. Sloan, 1999-NMCA-048, ¶ 45, 977 P.2d at 1020.   "[T]he fairness of the settlement should be determined as of the time the matter is presented to the court for decision." Shelton v. Sloan 1999-NMCA-048, ¶ 45, 977 P.2d at 1020.   "A party seeking to repudiate a court approved settlement has the burden of proving the agreement was a product of fraud, misrepresentation, overreaching of authority, or mutual mistake." Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047, ¶ 28, 664 P.2d at 1006.

---

[7]The Court was unable to discover any Supreme Court of New Mexico cases ruling on the appropriate test for approving a settlement involving minors.   The Court, however, has uncovered several Court of Appeals of New Mexico cases developing the appropriate test. The Court concludes that the Supreme Court of New Mexico would follow the Court's of Appeals of New Mexico precedent, because the jurisprudence has a long unchallenged history, and because Supreme Court of New Mexico dicta has indicated it has approved the Court's of Appeals of New Mexico test.   See Collins on Behalf of Collins v. Tabet, 806 P.2d 40, 49 (1991)("The guardian ad litem thus may fulfill the dual role of providing information to the court to enable it to pass on the reasonableness of a settlement.")   Based on this prediction, the Court, sitting in diversity, will apply the test as explained by the Court of Appeals of New Mexico. See Wade v. EMCASCO Ins. Co., 483 F.3d at 666.

**LAW REGARDING GUARDIANS AD LITEM VIS-À-VIS SETTLEMENTS
WITH MINORS**

"[W]here one of the beneficiaries is a minor, it is often the practice to seek court approval

of any settlement and appointment of a guardian ad litem to advise the district court on the

appropriateness of the allocation of settlement amounts." Spoon v. Mata, 2014-NMCA-115, ¶

21, 338 P.3d 113, 119 (citing Collins ex rel. Collins v. Tabet, 1991-NMSC-013, ¶¶ 30-31, 806

P.2d 40, 49). "When a guardian ad litem is appointed . . . it is very clear that the guardian ad

litem is an arm of the court." Kimbrell v. Kimbrell, 2014-NMSC-027, ¶ 17, 331 P.3d 915, 920.

"The general rule is that a next friend or guardian ad litem acting for a minor may negotiate a

compromise or settlement, but such compromise or settlement is not binding on the infant in the

absence of judicial approval." Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-

047, ¶ 28, 664 P.2d at 1006.

**LAW REGARDING NEW MEXICO'S DEATH BY WRONGFUL ACT OR NEGLECT
STATUTE**

"Recovery for wrongful death is provided for and carefully circumscribed by statute."

National Roofing, Inc. v. Alstate Steel, Inc., 2016-NMCA-020, ¶ 9, 366 P.3d 276, 780

(2015)(citing N.M. Stat. Ann. § 41-2-3 ("Wrongful Death Statute")). Pursuant to New Mexico's

Wrongful Death Statute:

> The proceeds of any judgment obtained in any [wrongful death]
> action . . . shall be distributed as follows:
>
> A.  if there is a surviving spouse and no child, then to the spouse;
>
> B.  if there is a surviving spouse and a child or grandchild, then one-half
>     to the surviving spouse and the remaining one-half to the children
>     and grandchildren, the grandchildren taking by right of
>     representation;

C.  if there is no husband or wife, but a child or grandchild, then to such child and grandchild by right of representation;

D.  if the deceased is a minor, childless and unmarried, then to the father and mother who shall have an equal interest in the judgment, or if either of them is dead, then to the survivor;

E.  If there is no father, mother, husband, wife, child or grandchild, then to a surviving brother or sister if there are any; and

F.  if there is no kindred as named in Subsections A through E of this section, then the proceeds of the judgment shall be disposed of in the manner authorized by law for the disposition of the personal property of deceased persons.

N.M. Stat. Ann. § 41-2-3.  If a wrongful death estate prevails in a wrongful death action, "the personal representative has a nondiscretionary duty to distribute the wrongful death proceeds in the ratio prescribed by the Wrongful Death Act." Spencer v. Barber, 2013-NMSC-010, ¶ 22, 299 P.3d 388, 396 (2013).

## ANALYSIS

In this case, the Court must determine how to divide one million dollars amongst a family.  It further must resolve how the two children's allocation will be disbursed until they reach the age of majority.  The Court's touchstone in this determination is fairness and the best interests of the children.  See Shelton v. Sloan, 1999-NMCA-048, ¶ 42, 977 P.2d at 1020 (Concluding that the Court's role is to "review[] the fairness of the agreement itself."); Garcia v. Middle Rio Grande Conservancy Dist., 1983-NMCA-047, ¶ 30, 664 P.2d 1000, 1006 (citing United States v. Reilly, 385 F.2d 225 (10th Cir. 1967)("In passing upon settlements dealing with claims or rights of minors, the court must determine whether the approval of a compromise would be in the best interests and welfare of the minor child.")).[8]  In making its determination,

---

[8]The Plaintiffs argue that the four-factor test from Jones v. Nuclear Pharmacy, Inc., 741

- 26 -

the Court has considered the Plaintiffs' proposals, their Motion, Ms. Oakey's Report, her

Guardian Ad Litem Proposal, and the testimony heard from Mares-Moreno, S. Alvarez, and Mr.

Tombs. Based off of those considerations, the Court concludes the following settlement

apportionment is fair and in the best interests of the children at the time it was presented to the

Court:

| Court's Apportionment Ruling | | | | |
|---|---|---|---|---|
| Claimant | G. Alvarez | J. Alvarez | Mares-Moreno | S. Alvarez |
| Amount | $500,000.00 | $225,000.00 | $200,000.00 | $75,000.00 |

The Court also concludes that a $500.00 per month allocation from J. Alvarez' trust to S.

Alvarez is appropriate until J. Alvarez' eighteenth birthday. Finally, the Court concludes that a

monthly allocation from G. Alvarez' trust would be inappropriate, but her trust may have

language that Mares-Moreno can apply to the trustee for expenses.[9]

---

F.2d at 324 ("Jones"), governs the Court's analysis. The Court concludes that the Jones factors govern a court's approval of a class action settlement pursuant to rule 23.1 of the Federal Rules of Civil Procedure. See Jones, 741 F.2d at 324. In Jones, the Tenth Circuit applied those factors to a class action settlement arising from a federal securities law claim. This settlement is not a class action settlement nor does the underlying claim arise from federal law. The Court declines to adopt those factors as the rubric for evaluating a settlement agreement's fairness that involves minor children. Under Erie, a federal court, sitting in diversity, is meant to act as much like a state court as possible so that parties do not suffer a different result by being in federal court. See Butt v. Bank of Am., N.A., 477 F.3d at 1179 (10th Cir. 2007).

[9]J. Alvarez' trust may also have that same language. College is great, but if the children are not educated and cared for well before then, they may not be ready for college or may not be ready to excel in college. It may be more important to front-load education expenses or other costs so that they have a healthy childhood. The Trustee should be able to help with private school, for example, or other expenses. Private school, early in life, may be appropriate to make sure that they can succeed in college, in their careers, and in their lives. The Court also concludes that a $1,000.00 per month distribution to J. Alvarez after J. Alvarez' eighteenth birthday until his twenty-fifth birthday is appropriate, and that a $1000.00 per month distribution to G. Alvarez after G. Alvarez' eighteenth birthday until her twenty-fifth birthday is also appropriate.

In coming to this determination, the Court looks first to the appropriate apportionment for the children. As the Defendants noted at the hearing, if this action was purely a wrongful death action, J. Alvarez could, at most, receive $250,000.00. See N.M. Stat. Ann. § 41-2-3(B); Spencer v. Barber, 2013-NMSC-010, ¶ 22, 299 P.3d at 396 ("[T]he personal representative has a nondiscretionary duty to distribute the wrongful death proceeds in the ratio prescribed by the Wrongful Death Act."). The $250,000.00 amount is not necessarily a ceiling for J. Alvarez' recovery, because a higher allocation could be in his best interest, but given that the parties have generally agreed on the amounts for Mares-Moreno and S. Alvarez, allocating more to J. Alvarez than $250,000.00 would require taking money from G. Alvarez. The Court concludes that allocating more than $250,000.00 to J. Alvarez would not be in G. Alvarez' best interest.

G. Alvarez sustained extensive injuries from the accident including an injury to her head. See Tr. at 33:25-35:10 (Mares-Moreno, Oakey). The Court has no reason to doubt the testimony that G. Alvarez has made a strong physical recovery, but injuries at young ages, even if seemingly mended, can have life-long effects. See Sherri L. Goldstrohm & Sharon Arffa, Preschool Children with Mild to Moderate Traumatic Brain Injury: An Exploration of Immediate and Post-Acute Morbidity, 20 Archives of Clinical Neuropsychology 675, 684-85 (2005)(Determining that children without a mild or moderate brain injuries performed better in standardized testing). The Court's conclusion is in accord with Ms. Oakey's Report that $400,000.00 is unfair and unreasonable to G. Alvarez given G. Alvarez' severe injuries, her "arguable future medical needs," and loss of her mother. Report at 7. From a $400,000.00 allocation, Mr. Tombs projects that G. Alvarez would have around $245,000.00 to invest after medical and legal expenses. The Court determines that a higher amount is needed to align with G. Alvarez' best interests.

The Court, however, adopts a $500,000.00 allocation for G. Alvarez instead of the $525,000.00 amount that Ms. Oakey recommends. In coming to this conclusion, the Court balances J. Alvarez' interests against G. Alvarez'. J. Alvarez lost his mother and has little, if any, contact with his biological father. See Tr. at 19:1-5 (Allen, Alvarez). There is a risk that, if J. Alvarez loses his grandparents, he will have no guaranteed support. In allocating $500,000.00 and $225,000.00 to G. Alvarez and J. Alvarez respectively, the Court concludes that it is providing the appropriate amount to each child based on G. Alvarez' injuries and J. Alvarez living situation. Both children will have money set aside for college, and, should Mr. Tombs' projections materialize, both children will have sums waiting for them on their twenty-fifth birthdays. See Tr. at 50:8; id. at 50:1; id. at 50:16-24; id. at 51:15-24 (Tombs).

For similar reasons, the Court concludes that a $500.00 per month allocation to S. Alvarez until J. Alvarez' eighteenth birthday is appropriate. That allocation, coupled with the $708.00 per month social security distribution, will provide S. Alvarez a steady source of support income for J. Alvarez without draining the trust by S. Alvarez' twenty-fifth birthday. Based on Mr. Tombs' projections, a $750.00 per month allocation at $200,000.00 would leave J. Alvarez with almost no principal remaining by his twenty-fifth birthday. See Tr. at 91:20-92:1; id. at 92:17 (Tombs). One reason for this might be that a $750.00 per month distribution appropriates the trust's entire projected monthly interest, sapping the trust's growth potential. See Tr. at 92:21-22 Accordingly, a $500.00 distribution better aligns with J. Alvarez' interests.[10]

After allocating $500,000.00 and $225,000.00 to G. Alvarez and J. Alvarez, the remaining $275,000.00 must be divided between Mares-Moreno and S. Alvarez. At all stages of

---

[10]A monthly distribution is not in G. Alvarez' best interest given that her father is legally obligated to support her.

settlement negotiations, all parties have agreed that $200,000.00 is a proper settlement amount for Mares-Moreno. See Report at 2, 8 n.11. The Court sees no reason to disrupt this agreement. Finally it determines that $75,000.00 is appropriate for S. Alvarez, because there appears to have been general agreement that S. Alvarez should receive less than the other parties. Compare Plaintiffs' Compromise Proposal (allocating S. Alvarez $100,000.00) with Guardian Ad Litem's Proposal (allocating S. Alvarez $75,000.00). The Plaintiffs also represent that they allocated more to S. Alvarez in general so that he could better provide for J. Alvarez, but that the trust payments "accomplish[] the clients' goal." Tr. at 60:22-61:4 (Glasheen). The Court concludes the monthly distribution from J. Alvarez' trust meets that concern and, accordingly, allocates $75,000.00 to S. Alvarez.

At this juncture, the Court cannot grant either the Petition or the Plaintiffs' Motion, because the settlement's terms currently differ from the Court's determination contained within this Memorandum Opinion and Order. To resolve this matter, the appropriate course is for the parties to submit a new settlement agreement, in accordance with this Memorandum Opinion and Order, for the Court to approve.

**IT IS ORDERED** that: (i) the parties' Stipulated Petition for Approval of the Settlement of Minors' Claims, filed January 11, 2017 (Doc. 25), is denied; and (ii) Plaintiffs' Motion to Approve Settlement, filed July 10, 2017 (Doc. 33), is denied. The Parties have leave to file a Motion to Approve a Settlement pursuant to the terms described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kevin Glasheen
Jason Medina
Chad Inderman
Glasheen, Valles, Inderman & DeHoyos LLP
Lubbock, Texas

     *Attorneys for the Plaintiffs*

Meena H. Allen
Allen Law Firm, LLC
Albuquerque, New Mexico

     *Attorneys for the Defendants*

Kathleen M.V. Oakey
Albuquerque, New Mexico

     *Guardian Ad Litem*